# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Edward W.,

Case No. 18-cv-2175 (ECW)

Plaintiff,

v.

**ORDER**

Andrew Saul,[1] Commissioner
of Social Security,

Defendant.

This matter is before the Court on Plaintiff Edward W.'s ("Plaintiff") Motion for

Summary Judgment (Dkt. 17) and Defendant Commissioner of Social Security Andrew

Saul's ("Defendant") Motion for Summary Judgment (Dkt. 20). Plaintiff filed this case

seeking judicial review of a final decision by Defendant denying his application for

disability insurance benefits. For the reasons stated below, Plaintiff's Motion is denied,

and Defendant's Motion is granted.

## I.     BACKGROUND

On February 18, 2015, Plaintiff filed an application for disability insurance

benefits. (R. 215-221.) Plaintiff also filed an application for supplemental security

income on February 11, 2015. (R. 209-214.) In both applications, the alleged disability

began on November 7, 2012. (R. 66-67, 209, 215.) Plaintiff applied for benefits,

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul, Commissioner of
Social Security, is automatically substituted as a party in place of Nancy A. Berryhill,
former Acting Commissioner of Social Security.

alleging disability due to mental disability, post-traumatic stress disorder ("PTSD"), hallucinations, depression, anxiety, anger issues, and schizophrenia. (R. 66-67.) His application was denied initially and on reconsideration. (R. 140-44, 152-54, 156-58.) Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on August 17, 2017 before ALJ David Washington. (R. 15-36.) The ALJ issued an unfavorable decision on October 17, 2017, finding that Plaintiff was not disabled through the date of the ALJ's decision. (R. 36.) Plaintiff was 40 years old at the time of the ALJ's decision. (R. 35.) While Plaintiff represented to the Commissioner that he had never received his GED (R. 47) and that he only completed the eighth grade (R. 242), the record shows that he completed his GED in 2007, represented that he graduated high school, and went on to receive an Auto Body Shop certificate from St. Paul College (R. 242, 354, 741).

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since November 7, 2012. (R. 17.)

---

[2] The Eighth Circuit described this five-step process as follows:

The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the

At step two, the ALJ determined that Plaintiff had the following severe impairments: major depressive disorder (recurrent, severe, without psychotic features); schizoaffective disorder; posttraumatic stress disorder (chronic); cannabis abuse; learning disorder by history; borderline intellectual functioning; and antisocial personality disorder versus borderline personality disorder. (R. 17.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. 18-19.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to brief, infrequent and superficial contact with the public, coworkers, and supervisors; limited to unskilled work activity, routine, repetitive, work.

(R. 23.)

The ALJ concluded that Plaintiff was able to perform his past relevant work as an auto order picker and automobile detailer. (R. 34.) In addition, at the fifth step of the sequential analysis, and based on the testimony of the vocational expert ("VE"), the ALJ found that through the date last insured, considering the Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was capable of making a successful

---

Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

adjustment to other work that existed in significant numbers in the national economy, including the occupation of dryer attendant. (R. 35.) Accordingly, the ALJ deemed Plaintiff not disabled. (R. 36.)

Plaintiff requested review of the decision. (R. 4.) The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 1-3.) Plaintiff then commenced this action for judicial review. The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    MEDICAL RECORD

On January 10, 2013, Plaintiff presented to the Dorothy Day Center for a mental health assessment before licensed social worker Lindsay Anderson. (R. 499.) Plaintiff had no history of hospitalizations for mental health and no history of medication management for mental health. (*Id.*) Plaintiff professed experiencing depression since he was a child and that the depression had been ongoing since the day of its onset. (*Id.*) Plaintiff denied feeling that his life was not worth living. (*Id.*) Plaintiff was homeless and staying at the Dorothy Day Center. (*Id.*) Plaintiff was using marijuana five times a day to deal with his pain and muscle spasms. (R. 500.) Plaintiff professed thoughts of self-harm with no plan for suicide. (*Id.*) Plaintiff had thoughts about harming others, but denied ever harming anyone. (*Id.*) The mental health assessment showed that Plaintiff's appearance was appropriate; his attitude was cooperative; he was calm; had a broad-range

affect; had an up-and-down mood; expressed auditory and visual hallucinations, including talking to himself in his head in a different voice, which told him to be angry and look mean, and he claimed to see bad spirits (including the devil); he was fully oriented; had an intact memory; and experienced flashbacks, nightmare, and terrors. (R. 500-01.) Plaintiff was diagnosed with major depression psychotic behavior, cannabis abuse, and PTSD. (R. 501.) Anderson characterized Plaintiff's major depression as severe based on a PHQ-9 depression assessment, in which Plaintiff claimed that over the past two-week period he had: several days of having little interest or pleasure in doing things; he was depressed or feeling down more than half of the time; he had daily trouble related to sleeping; had little energy, a poor appetite, and concentration problems every day; and had several days of feeling like he was better off dead. (R. 502.) According to Plaintiff, these problems had made it somewhat difficult for Plaintiff to work, take care of things at home, or get along with other people. (*Id.*)

On January 15, 2013, Plaintiff saw psychiatrist John Rauenhorst, M.D., for a mental health visit. (R. 493.) Plaintiff represented that he last worked the previous year in a warehouse, but the job had ended, and he could not go back to work because of old leg injuries. (*Id.*) Plaintiff presented with symptoms of depression which had been present for greater than two weeks. (*Id.*) Plaintiff denied any thoughts of self-harm. (R. 494.) Plaintiff's appearance was appropriate and disheveled; he was cooperative and calm; he had an appropriate affect; he displayed a depressed and anxious mood; showed a circumstantial thought process; denied hallucinations; he was fully oriented; and had an intact memory. (R. 495.) Plaintiff was diagnosed with major depression, and a rule-out

diagnosis for PTSD. (R. 495-96.) Plaintiff was prescribed with Sertraline (Zoloft). (R. 496-97.)

On February 14, 2013, Plaintiff had a follow-up visit with Dr. Rauenhorst. (R. 489.) Plaintiff noted that the Zoloft previously prescribed had been helping him with no side effects and he needed a refill. (*Id.*) Plaintiff denied any intention of harming himself. (*Id.*) Plaintiff's mood had improved with less anxiety. (*Id.*) His mental assessment remained unchanged, except that his mood was improved, and his thought process was more organized. (R. 490.) Plaintiff was diagnosed with major depression with psychotic behavior, cannabis abuse, and a rule-out diagnosis for PTSD. (R. 490-91.)

Plaintiff again saw Dr. Rauenhorst on February 26, 2013. (R. 485.) Plaintiff asserted that he thought his medications were working, but that he still felt negative. (*Id.*) Plaintiff's mood was relaxed, and he was less anxious. (*Id.*) Plaintiff was diagnosed with major depression with psychotic behavior, cannabis abuse, and a rule-out diagnosis for PTSD. (R. 486-87.) The depression was characterized as better or improved, and Plaintiff did not want any additional medications. (R. 487.)

On March 28, 2013, Plaintiff saw Dr. Rauenhorst for a mental health follow-up. (R. 481.) Plaintiff requested a medication change. (*Id.*) Plaintiff asserted that he was not sleeping well and felt that the medications did not work. (*Id.*) Dr. Rauenhorst believed that Plaintiff was not regularly taking his medications. (R. 481-82.) Dr. Rauenhorst noted that Plaintiff was relaxed, depressed, and more negative. (*Id.*) Plaintiff was diagnosed with major depression (moderate), cannabis abuse, and a rule-out diagnosis for PTSD. (R. 482-83.) Plaintiff continued to smoke marijuana daily. (R. 483.)

On April 9, 2013, Plaintiff saw Dr. Rauenhorst for another mental health follow-up. (R. 477.) Plaintiff reported running out of medications three days earlier. (*Id.*) Plaintiff represented that he felt that his medications were helping him feel less irritable and anxious. (*Id.*) Plaintiff had lost more weight and had been thinking about jumping off a bridge, without any intention to carry out such a plan. (*Id.*) Plaintiff's appearance was appropriate, he was cooperative but irritable, he was agitated, his affect was appropriate, his mood was depressed and more negative, his thought process was intact and more organized with no hallucinations, he was fully oriented, and had an intact memory. (R. 477-78.) Dr. Rauenhorst noted that Plaintiff's depression was still a problem and was worse when he did not have medications. (R. 479.) Plaintiff was prescribed with Zoloft and Seroquel. (*Id.*)

On April 18, 2013, Plaintiff underwent a consultative examination conducted by Reena Pathak, Psy.D., L.P., at South Metro Human Services. (R. 352.). Dr. Pathak conducted a clinical interview. (*Id.*) In addition, the following testing was performed: a Montreal cognitive assessment test, a Wechsler adult intelligence scale test, a Weschler test of adult reasoning, a repeatable battery for the assessment of neuropsychological status, and a Delis Kaplan Executive Function System Trail Making Test. (R. 353.) Dr. Pathak diagnosed Plaintiff with major depressive disorder recurrent (severe), PTSD, cannabis abuse, borderline intellectual functioning, and learning disorder by history. (*Id.*) While Plaintiff reported using marijuana to deal with anxiety, Dr. Pathak explained that "while cannabis appears to have been a contributing factor to affective and behavioral disturbance, it does not appear to have been the main precipitant." (*Id.*) According to Dr.

Pathak, Plaintiff identified the following signs and symptoms: sleep disturbance, mood disturbance (depression, anxiety), emotional lability, substance dependence, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt/worthlessness, social withdrawal or isolation, an inappropriate affect, decreased energy, generalized persistent anxiety, difficulty thinking or concentrating, hostility and irritability, and suicidal ideation. (R. 353-54.)

During Plaintiff's mental status examination with Dr. Pathak, Plaintiff presented as being alert and oriented to all spheres. (R. 354.) His eye contact was appropriate. (*Id.*) Grooming and hygiene were appropriate. (*Id.*) He was pleasant and cooperative with an anxious mood and constricted affect. (*Id.*) His speech was generally goal directed but his responses tended to be vague. (*Id.*) There were no apparent difficulties regarding comprehension of interview questions or assessment instructions, and Plaintiff was a fair historian. (*Id.*) Plaintiff acknowledged passive suicidal ideations, but denied any intent or plan. (*Id.*)

As part of the assessment, Plaintiff completed the Montreal Cognitive Assessment ("MOCA"), a mini-mental status examination. (*Id.*) He attained a score of 18 out of 30, which fell below the normal range. (*Id.*) Areas of difficulty included visuospatial construction (copy of a figure, clock drawing), executive functioning (trail making), language repetition, verbal abstract reasoning, and delayed recall. (*Id.*) In addition, Plaintiff was unable to recall any of the five random words after a five-minute delay. (*Id.*)

Plaintiff reported that he had been previously incarcerated 9 to 10 years for felony charges related to selling drugs and assault, but reported he had no further involvement in the legal system since 1995. (R. 355.) Plaintiff also reported that he was last employed in 2011. (*Id.*) Plaintiff represented having no history of difficulties getting along with bosses and coworkers. (*Id.*) He did identify difficulty managing stress, causing him to walk off the job at times. (*Id.*) Plaintiff had never been fired from a job. (*Id.*)

Plaintiff reported a history of depression, general anxiety, and PTSD that included frequent suicidal ideation as a child and significant difficulties managing his temper. (*Id.*) As it relates to depression, Plaintiff identified experiencing low motivation, loss of interest, anhedonia ("there's nothing to live for"), low energy/fatigue, impaired sleep, irritability, negative and intrusive thoughts, feelings of helplessness/hopelessness, feelings of worthlessness, and loss of appetite. (*Id.*) Plaintiff also identified experiencing high reactivity, poor anger management, racing intrusive thoughts, flashbacks (gunshots, being chased, and being beaten up), vivid nightmares, intrusive memories, and thoughts, avoidance of triggers (crowds, violent shows/movies), hypervigilance (carrying a gun for protection, frequent fighting), and an exaggerated startle response. (*Id.*) Further, Plaintiff claimed experiencing auditory perceptual disturbances of voices or "strong thoughts" telling him to do things, such as hurting others. (*Id.*) He also claimed that he saw "spirits." (*Id.*)

The Wechsler adult intelligence scale test results showed that Plaintiff's full-scale IQ fell in the extremely low range. (R. 356-57.) Within the various subtests, Plaintiff scored an 80 (low average to borderline) in verbal comprehension, 65 (extremely low) in

perceptual reasoning, 77 (borderline) in working memory, and 76 (borderline) in processing speed. (*Id.*) Based on the testing, Dr. Pathak opined that Plaintiff's "[o]verall intellectual functioning is consistent with **mild** cognitive impairment with perceptual reasoning as an area of relative weakness." (R. 358 (emphasis added).) Plaintiff's testing also showed that his immediate recall and delayed recall were both severely impaired. (*Id.*) Dr. Pathak also opined as follows regarding the implications of the testing:

> In terms of the neurocognitive findings, the primary areas of dysfunction surround processing speed, immediate memory, working memory, visual memory, visual motor organization and speed, aspects of executive functioning, and auditory and visual attention. Involvement of the frontal lobes, right parietal lobes, and related temporal areas are implicated. The most likely etiologies appear to be related to developmental learning difficulties, effects of multiple untreated head injuries and psychiatric symptoms surrounding affective dysregulation and inability to manage stress. The effects from head injury are likely stable, thus variability in cognitive and behavioral functioning is likely due to variability in psychiatric symptoms. As [Plaintiff] is not involved in consistent psychiatric or therapeutic supportive services, this is unlikely to abate within 12 months, even with sobriety. Additionally, assessment results suggest that repetition and rehearsal do not aid in learning and memory. It is likely that slowed and inefficient processing speed is a contributing factor. Namely, when processing speed is slowed information does not get into short-term memory effectively and then will fade before it can be consolidated into long term memory storage.

(*Id.*) Dr. Pathak ultimately opined that "[i]t does not appear likely that [he] would be able to establish and maintain employment at this time without stabilization, therapeutic supports, and vocational supports." (R. 358-59.) As to Plaintiff's mental abilities and aptitude to do unskilled work, Dr. Pathak opined that Plaintiff had a "Fair" ability to: understand and remember very short and simple instructions; carry out very short and simple instructions; maintain attention for two-hour segments; maintain regular

attendance and be punctual within customary, usually strict tolerances; make simple work-related decisions; perform at a consistent pace without an unreasonable number and lengths of rest periods; ask simple questions or request assistance; respond appropriately in a routine work setting; and be aware of normal hazards and take appropriate precautions. (R. 360.) Dr. Pathak also found that Plaintiff had a "poor" or no ability to: remember work-like procedures; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; and deal with normal work stress. (*Id.*) Dr. Pathak did not specifically identify any particular medical or clinical findings which supported her opinion regarding these limitations in the portion allotted in her report. (*Id.*)

On May 7, 2013, Plaintiff had a mental health visit with Dr. Rauenhorst. (R. 472.) Plaintiff had trouble sleeping and complained that he could not sleep with others around. (*Id.*) Plaintiff believed he needed additional Seroquel in order for him to sleep better. (*Id.*) He also professed that he thought about shooting himself, but did not own a gun. (*Id.*) Plaintiff remained significantly depressed and felt that this was in part because he was not sleeping well. (R. 474.) As a result, Plaintiff wanted to increase the dosage of Seroquel. (R. 474.) Dr. Rauenhorst agreed to increase the dosage of Seroquel. (*Id.*) Plaintiff was diagnosed with PTSD and prescribed with sertraline. (R. 475.) Dr. Rauenhorst filled out a medical opinion diagnosing Plaintiff with major depression and

cannabis abuse, which was expected to last at least 60 days during which he was unable to work at least until July 7, 2013. (R. 819.)

During a May 23, 2013 preoperative appointment related to his foot, Plaintiff professed wanting to seek a new psychiatrist, as he was not happy with his medications due to weight loss. (R. 700.) Plaintiff claimed he was irritated a lot, staying away from people, sometimes having thoughts of hurting people, "visions of people drowning in the water - dreaming about being in jail and hurting people." (R. 701.) Plaintiff asserted that he did not want to hurt anyone in particular. (*Id.*) He contracted for safety despite telling the doctor that he did have thoughts about hurting people. (*Id.*) He was highly motivated to have his surgery and stated that he would never hurt a doctor, nurse, or anyone in the hospital helping him. (*Id.*) Plaintiff's negative thoughts revolved around people he knew from the Dorothy Day Center, or in the neighborhood who he felt bullied him. (*Id.*) In a post-operative note, Plaintiff asserted that he had been finding ways of addressing his frustrations with a roommate. (R. 707.)

On June 6, 2013, Plaintiff saw Dr. Rauenhorst. (R. 466.) Plaintiff had been regularly taking his medications, but was still depressed. (*Id.*)

On June 13, 2013, Plaintiff saw Dr. Rauenhorst related to his inability to sleep and his use of marijuana. (R. 459.) Plaintiff did note that his depression was better, but that he could not sleep. (*Id.*) Plaintiff was diagnosed with major depression, moderate, and a rule-out diagnosis for PTSD. (R. 460-61.) Plaintiff was prescribed with Remeron (mitrazapine) given that his other medications were not working for him. (R. 461.)

During a July 8, 2013 mental health visit, Dr. Rauenhorst diagnosed Plaintiff with improved major/moderate depression. (R. 452, 454.) Plaintiff described a depressive mood, and in some ways was better, but he remained very irritable and negative. (R. 454.) Plaintiff's appearance was appropriate; he was agitated; his affect was appropriate; he was depressed; his thought process was intact and more organized; he had no hallucinations; he was fully oriented; and had an intact memory. (R. 453.) Plaintiff was diagnosed with major depression, cannabis abuse, and a rule-out diagnosis for PSTD. (*Id.*) Plaintiff was smoking synthetic marijuana, instead of marijuana. (R. 452.)

On July 22, 2013, Plaintiff showed no signs or symptoms from depression, his mood had been stable, but he was feeling frustrated. (R. 712.)

On August 5, 2013, Plaintiff saw Dr. Rauenhorst related to his mental health. Plaintiff complained of nightmares, with no relief from medications. (R. 448.) He noted he would wake up and not be able to fall asleep for two hours after a nightmare. (*Id.*) Plaintiff admitted to using marijuana daily. (*Id.*) Plaintiff's appearance was appropriate; he was cooperative, but irritable; his affect was appropriate; he was depressed; his thought process was intact and more organized; he had no hallucinations; he was fully oriented; and had an intact memory. (R. 449.) Plaintiff was diagnosed with major depression, which was improved, cannabis abuse, and a rule-out diagnosis for PTSD. (R. 449-50.)

On August 15, 2013, Plaintiff saw Dr. Laurel Gamm for a respite check. (R. 445.) According to Dr. Gamm, Plaintiff was not in any acute distress, he was alert and oriented,

his thought content and affect appeared normal, and he maintained good eye contact.  (R. 445-46.)

On August 28, 2013, Plaintiff again saw Dr. Gamm for a respite check.  (R. 438.) According to Dr. Gamm, Plaintiff's thought content and affect appeared normal, he had good eye contact, and his normal short-term memory was grossly normal.  (R. 439.)

On September 3, 2013, Plaintiff reported to Dr. Rauenhorst that he was more depressed.  (R. 434.)  Plaintiff represented that he had a lot of pain with an infection in his foot, and felt like dying to be to be rid of the pain, but he had no plans to harm himself.  (R. 434-35.)  Plaintiff's appearance was appropriate, he was irritable and very negative, his affect was appropriate, he was relaxed but depressed, his thought process was more organized, he had no hallucinations, he was fully oriented, and had an intact memory.  (R. 435.)  Plaintiff was diagnosed with major depression.  (*Id.*)  Dr. Rauenhorst also filled out a medical opinion diagnosing Plaintiff with major depression, which was expected to last at least 60 days during which he was unable to work at least until December 1, 2013.  (R. 820.)

On September 11, 2013, Plaintiff had a screening with Dr. Gamm at the Dorothy Day Center.  (R. 431.)  Plaintiff did not appear in acute distress, his thought content appeared normal, and his short-term memory was grossly normal.  (R. 431-32.)  Plaintiff denied any hallucinations.  (R. 432.)  Plaintiff complained of anxiety and depression, with fleeting suicidal thoughts, but he had no plan to act on those thoughts.  (*Id.*)  Plaintiff was diagnosed with moderate major depression.  (*Id.*)

On September 17, 2013, Plaintiff reported irritability and increased thoughts of self-harm.  (R. 427.)  He had been started on sertraline, which made him feel better, but he had run out of the medication.  (*Id.*)  Plaintiff complained of no new medical problems.  (*Id.*)

On October 29, 2013, Plaintiff saw Dr. Rauenhorst for a follow-up related to his mental health and a prescription refill.  (R. 423.)  Plaintiff's mood was anxious and depressed.  (*Id.*)  Plaintiff's appearance was appropriate; he was cooperative and irritable; he had an appropriate affect; he was more organized; was fully oriented; and had an intact memory.  (*Id.*)  Plaintiff reported no hallucinations.  (*Id.*)  Plaintiff was diagnosed with major depression, cannabis abuse, and rule-out diagnosis for PTSD.  (R. 423.)  Plaintiff ran out of medications and was getting worse.  (R. 424.)  Plaintiff was so negative about the other residents that it was difficult to discuss his symptoms.  (*Id.*)  Dr. Rauenhorst increased Plaintiff's dosage of sertraline.  (R. 425.)

On December 2, 2013, Plaintiff had a mental health office visit with Dr. Rauenhorst.  (R. 419.)  Plaintiff had run out of his medications.  (*Id.*)  Plaintiff indicated that the medications definitely helped and that he was worse without the medications.  (*Id.*)  Plaintiff reported no new problems since his previous visit and admitted that he was still using marijuana.  (*Id.*)  Plaintiff reported no hallucinations but believed that he could dream about the future.  (R. 420.)  Plaintiff was cooperative, but irritable, he was agitated and very negative, had an appropriate affect, was depressed and anxious, was fully oriented, and his memory was intact.  (R. 419-20.)  Dr. Rauenhorst noted that Plaintiff's depression had deteriorated.  (R. 421.)  According to Dr. Rauenhorst, Plaintiff was

describing odd thoughts, and was borderline delusional if not outright delusional. (R. 421.) Dr. Rauenhorst noted that some of this could have been the marijuana use, but also noted that it could also have been the result of a psychotic disorder. (R. 421.) Plaintiff and Dr. Rauenhorst agreed to start Plaintiff on Seroquel as well as continue the sertraline. (R. 421.)

On January 7, 2014, Plaintiff saw Dr. Rauenhorst for a mental health office visit. (R. 415.) Plaintiff reported that he was "doing all right" and represented that his medications were helping him. (*Id.*) Plaintiff did represent that he had trouble getting along with people despite his medications. (*Id.*) Plaintiff asserted that he had no new medical problems since his last visit, and a review of his system were unremarkable. (*Id.*)

During a January 9, 2014 preoperative examination, it was noted that Plaintiff had an appropriate mood and affect with no active homicidal ideation. (R. 724.)

On March 24, 2014, Plaintiff came to Dr. Rauenhorst needing a prescription refill. (R. 410.) He was more tense and could not sleep without medications. (R. 410.) Plaintiff had a depressed mood most of the day and had a diminished interest in his usual daily activities. (*Id.*) According to Dr. Rauenhorst, Plaintiff was doing better, at least by his estimate when he had the medications, but then he would run out of his medications and be back to where he was. (R. 413.) While Dr. Rauenhorst believed that Plaintiff should have been on a higher dosage of medication, Plaintiff refused. (*Id.*) Plaintiff was diagnosed with major depression, unchanged from the previous visit. (*Id.*)

On April 21, 2014, Plaintiff saw Dr. Rauenhorst with reports of feeling more depressed. (R. 405.) Plaintiff reported missing his social security hearing. (*Id.*) Plaintiff's appearance was appropriate and disheveled; he was cooperative but irritable; he was agitated; his affect was appropriate; his mood was depressed; his thought process was more organized with no hallucinations; he was fully oriented; and had an intact memory. (R. 406.) Plaintiff was diagnosed with moderate major depression, cannabis abuse, and a rule-out diagnosis for PTSD. (R. 406-07.)

On May 27, 2014, Plaintiff saw Dr. Rauenhorst for a mental health follow-up after running out of his medications. (R. 400.) Plaintiff reported feeling more irritable, but had no new medical problems. (*Id.*) He had no thoughts of suicide. (*Id.*) Plaintiff claimed his mood was "up and down." (*Id.*) The mental status assessment showed: that his appearance was appropriate and disheveled; his attitude was cooperative, irritable, and very negative; his motor activity was agitated; his affect was appropriate; his mood was depressed; his thought process was intact and more organized; he professed hearing voices; he was fully oriented; and his memory was intact. (R. 401.) Plaintiff was diagnosed with depression, cannabis abuse, and a rule-out diagnosis for PTSD. (R. 402.) Dr. Rauenhorst's impression was that Plaintiff was suffering from PTSD. (R. 403.) Dr. Rauenhorst noted that Plaintiff claimed to be doing better, but Plaintiff did not want to increase the dosage of his medications. (*Id.*) Plaintiff was prescribed with sertraline and Seroquel. (R. 404.) Dr. Rauenhorst also filled out a medical opinion diagnosing Plaintiff with major depression and PTSD, which was expected to last at least 60 days during which he was unable to work at least until August 1, 2014. (R. 821.)

On June 30, 2014, Plaintiff saw Dr. Rauenhorst for his depression. (R. 395.) Plaintiff represented that he was feeling worse, and not "not doing good around people." (*Id.*) He had been taking his medications regularly but had run out and had been miserable. (*Id.*) Dr. Rauenhorst's mental status assessment showed that Plaintiff had a an appropriate and disheveled appearance; his attitude was cooperative, irritable and very negative; he had an appropriate affect; his mood was depressed and angry; his thought process was intact and more organized; he had no hallucinations, but had heard voices that morning; was fully oriented; and had an intact memory. (R. 396.) Plaintiff was diagnosed with schizoaffective disorder, cannabis abuse, and a rule-out diagnosis for PTSD. (R. 397.) Plaintiff had not used marijuana, but was still experiencing hallucinations and delusions. (R. 398.)

On July 21, 2014, Plaintiff presented to Dr. Rauenhorst with depression and complained that things were "not good." (R. 534.) Plaintiff claimed that the heat, other people, and his blood pressure all contributed to him feeling depressed. (*Id.*) Plaintiff asserted that he was sleeping until 1:00 p.m. (*Id.*) He was sleeping about seventeen hours out of twenty-four hours per day. (R. 537.) Plaintiff asserted that "he gets into fights when he is around others" and "gets into arguments frequently." (R. 534.) He was hearing voices telling him to fight. (R. 353, 357.) Dr. Rauenhorst believed that he was hallucinating. (R. 537.) Plaintiff was diagnosed with schizoaffective disorder, cannabis abuse, and a rule-out diagnosis for PTSD. (R. 536-37.)

On August 19, 2014, Plaintiff had a follow-up with Dr. Rauenhorst for a medication refill related to his depression. (R. 385.) Plaintiff claimed to be more

depressed and more withdrawn, but he had no new medical problems and had been taking his medications, including sertraline and Seroquel. (*Id.*) Plaintiff's mood was relaxed, but he was depressed and anxious. (*Id.*) He also reported the "voices are a bit worse." (*Id.*) He had no thoughts of harming himself. (R. 386.) Upon mental assessment, Plaintiff appeared appropriate and disheveled; he was cooperative, irritable and very negative; his affect was appropriate; his mood was characterized as relaxed and depressed; he professed auditory hallucinations, including hallucinations telling him to fight; and was fully oriented with an intact memory. (R. 386.) Dr. Rauenhorst noted that Plaintiff was hallucinating and was on minimal doses of antipsychotics, however, Plaintiff was very resistant to any change in his medications. (R. 388.) Plaintiff was diagnosed with schizophrenia, a rule-out for PTSD, and cannabis use. (R. 386-87.)

On October 6, 2014, Plaintiff had a follow-up with Dr. Rauenhorst regarding his depression. (R. 379.) Plaintiff claimed to be hearing voices calling to him during the night. (*Id.*) Plaintiff reported taking his medications, including sertraline and Seroquel, with no side effects. (R. 379, 381.) During Plaintiff's mental status assessment, Dr. Rauenhorst noted that Plaintiff's appearance was appropriate but disheveled; he was irritable and very negative; he was agitated; had an appropriate affect; his mood was depressed and anxious; he was experiencing auditory hallucinations with some insight; was delusional about staff or at least developing conspiracy ideas; he was fully oriented; and his memory was intact. (R. 380.) Plaintiff was diagnosed with schizoaffective disorder, cannabis abuse, and a rule-out diagnosis for PTSD. (R. 380-81.) The doctor noted that he believed that Plaintiff would benefit from additional antipsychotics. (R.

382.)  Dr. Rauenhorst also filled out a medical opinion diagnosing Plaintiff with schizoaffective disorder, which was expected to last at least 60 days during which Plaintiff was unable to work at least until January 1, 2015.  (R. 822.)

On October 14, 2014, a mental diagnostic assessment was performed by licensed social workers, including Plaintiff's case manager though Catholic Charities.  (R. 809.)  Plaintiff had been living at an apartment through Catholic Charities.  (*Id.*)  Plaintiff presented himself for counseling services per the recommendation of his case manager.  (R. 808.)  Plaintiff presented with symptoms of PTSD and a psychotic disorder.  (*Id.*)  Plaintiff denied a history of mental health treatment even though he had been receiving emergency mental health treatment by Dr. Rauenhorst.  (*Id.*)  Plaintiff claimed to have served three years in prison for assault and battery with a firearm when he opened fire on a liquor store, and served time for holding a family hostage.  (R. 807.)  He also reported memory issues after being hit in the head with a baseball bat as a child.  (*Id.*)  Plaintiff reported that he had been taking Seroquel for his PTSD and Zoloft for his anxiety.  (*Id.*)  Plaintiff presented as well kept, and casually dressed.  (*Id.*)  He also presented typical movements and behavior.  (*Id.*)  He exhibited a somewhat blunted affect.  (*Id.*)  Plaintiff reported a feeling of depression and friction related to his living situation and his inability to work because of his legal history.  (*Id.*)  It was also noted that Plaintiff "presents anger."  (*Id.*)  Plaintiff experienced auditory hallucinations, noting that he experienced them primarily when going to sleep or by himself.  (*Id.*)  Plaintiff had a history of acting on his hallucinations, including his unsubstantiated report that he hit a fellow inmate in the head with a metal tray and "split his wig."  (*Id.*)  Plaintiff was diagnosed with PTSD

and schizophrenia, paranoid type, partial remission. (*Id.*) The rationale for PTSD was that Plaintiff experienced night terrors based on his history of gang violence. (R. 809.) Plaintiff's schizophrenia diagnosis was based on his auditory hallucinations, his blunted emotional expression, and social withdrawal. (*Id.*) While it had been 20 years since any criminal charges, it was determined that it was important to monitor his homicidal ideation and the persecutory voices he heard. According to the social worker, "should his symptom picture change, this could be a dangerous combination, thus continued monitoring and support would be advised." (*Id.*) Weekly individual treatment was recommended. (R. 810.)

On October 27, 2014, Plaintiff saw Dr. Rauenhorst regarding his depression. (R. 374.) Plaintiff reported symptoms of depression, including significant weight loss, insomnia, and recurrent thoughts of death or suicide. (*Id.*) While Plaintiff had thoughts about ending his life, he denied planning his death. (*Id.*) During Plaintiff's mental status assessment, Dr. Rauenhorst noted that Plaintiff's appearance was appropriate but disheveled; he was irritable and negative, he was not as agitated, had an appropriate affect; his mood was angry, depressed, and anxious; his thought process was intact and more organized; he experienced auditory hallucinations; he had some insight; he was fully oriented; and his memory was intact. (R. 375.) Plaintiff was diagnosed with improved schizoaffective disorder. (R. 375-76.) Plaintiff's medications included sertraline and Seroquel. (R. 376.)

On November 12, 2014, Plaintiff went to the Ramsey County Mental Health Center stating that he needed to see a counselor. (R. 662.) Plaintiff reported that he slept

over twelve hours a day, was sad and hopeless, had recurrent thoughts and memories of his mother being verbally and emotionally abusive to him, had difficulty concentrating due to negative thoughts, claimed he experienced difficulty concentrating due to negative thoughts, and became easily fatigued and irritable. (*Id.*) Plaintiff also reported his belief that people were after him, he constantly saw shadows when he was alone, and claimed to be hearing voices daily that told him to hurt himself and others. (*Id.*) Plaintiff reported not having any family or friends, and asserted that he did not need any friends. (R. 662-63.) Plaintiff asserted that one of his strengths was having good communication skills. (R. 663.) Plaintiff was dressed neatly with good hygiene; he appeared tired and worried; his eye contact was appropriate; he was alert and attentive; he reported his mood to be anxious; his affect was congruent; his thought process was goal oriented; Plaintiff reported a history of auditory and visual hallucinations and described paranoia; he had no unusual motor movements; he denied suicidal ideations; showed a rapid speech pattern; and his insight appeared impaired. (*Id.*) Plaintiff was diagnosed with PTSD and unspecified schizophrenia spectrum. (R. 663-64.)

Licensed social worker Amu Acker diagnosed Plaintiff with PTSD and an unspecified psychotic disorder, and noted permanent mental limitations including auditory and visual hallucinations, paranoia, flashbacks, and nightmares related to trauma. (R. 363.) Acker opined that "Patient will not be able to perform work in the foreseeable future." (*Id.*) Acker also filled out a medical opinion diagnosing Plaintiff with PTSD and unspecified psychotic disorder, which was expected to last at least 45

days, and that he would not be able to perform employment in the foreseeable future. (R. 823.)

On November 24, 2014, Plaintiff saw Dr. Rauenhorst regarding his depression and for a medication refill. (R. 369.) Plaintiff reported that he felt anxious and angry. (*Id.*) Plaintiff also reported that there was a "spirit in his room" that kept him up at night. (*Id.*) Plaintiff also presented with symptoms of depression which had been present for greater than two weeks, with a depressed mood most of the day, and had a diminished interest in his usual daily activities. (*Id.*) Plaintiff denied suicidal thoughts. (*Id.*) During Plaintiff's mental status assessment, Dr. Rauenhorst noted that Plaintiff's appearance was appropriate but disheveled; he was irritable and negative; had an appropriate affect; his mood was angry, depressed and anxious; his thought process was intact and more organized; he experienced auditory hallucinations and voices every day with him talking to the voices; had some insight; he was fully oriented; and his memory was intact. (R. 370.) Plaintiff was diagnosed with deteriorating schizophrenia. (R. 371-72.) Plaintiff's medications included sertraline and Seroquel. (R. 371.) Dr. Rauenhorst and Plaintiff agreed to increase Plaintiff's dosage of Seroquel. (R. 372.)

Plaintiff also had a diagnostic assessment performed by psychiatrist Julie Praus, M.D., on November 14, 2014. (R. 661.) Plaintiff's primary concern was having his medical opinion form filled out, which was done separately by the Welcome Center staff, so he could obtain Social Security disability benefits. (R. 660.) Plaintiff complained of depression for most of his life but admitted to not seeking treatment prior to Dr. Rauenhorst. (*Id.*) Plaintiff also complained of chronic suicidal ideation, with no prior

psychiatric hospitalization or attempts. (*Id.*) Plaintiff claimed that he saw shadows when he was alone, talked about hearing voices, at times becoming another person, and at times being outside his body. (*Id.*) However, Dr. Praus noted that Plaintiff was vague about these claims, and that they were poorly described. (*Id.*) As part of her mental status exam for Plaintiff, Dr. Praus noted that Plaintiff "had considerable flirting with the nursing assistant as well as considerable jovial conversation." (R. 661.) Plaintiff was not in any sense sad. (*Id.*) He was alert and fully oriented. (*Id.*) Plaintiff was casually dressed. (*Id.*) Dr. Praus noted that Plaintiff displayed "[v]ery questionable veracity." (*Id.*) Plaintiff showed no bizarre behavior or attending to internal stimulus and showed normal movements and speech. (*Id.*) Dr. Praus diagnosed Plaintiff with depression disorder NOS, antisocial personality disorder, and probable malingering. (*Id.*)

On January 26, 2015, Plaintiff underwent a psychiatric diagnostic assessment by psychiatrist Yoshiko Hapke, M.D. (R. 655.) Plaintiff's chief complaint was that he continuously suicidal. (*Id.*) Plaintiff reported he started feeling suicidal from age nine and was suicidal during the assessment, but denied any plan or intent to hurt himself or other people. (R. 656.) Dr. Hapke indicated that while Plaintiff's chart indicated that he has complained of auditory hallucinations to kill himself and others in the past, Plaintiff had no present symptoms of psychosis. (*Id.*) Dr. Hapke noted that Plaintiff was "a limited historian initially, but later much more cooperative, and suddenly became a good historian." (R. 655.) Plaintiff refused Dr. Hapke's request to speak with Plaintiff's family. (*Id.*) Dr. Hapke could not figure out whether the Plaintiff was really hearing voices or if this was his way of describing severe depression. (R. 601.) Dr. Hapke also

noted that previous diagnoses included malingering. (*Id.*) Dr. Hapke recommend that

Plaintiff start an inpatient program. (R. 656.) Plaintiff's history included twenty years of

incarceration. (R. 657.) He shot his mother's boyfriend when he was nine and had also

been to prison for drug and gun charges. (*Id.*) Plaintiff claimed an extensive history of

physical fights, with his last fight occurring in October 2014. (*Id.*) Plaintiff noted that he

had last used marijuana in December 2014. (*Id.*) Plaintiff's medications included

Seroquel and Zoloft. (*Id.*) Dr. Hapke conducted a mental status exam for Plaintiff with

the following findings:

> The patient is casually dressed. The patient was malodorous with smell of
> urine. He was bright, pleasant. Gait is normal. Affect is sad. Denied any
> plan or intent to hurt himself. He was able to contract for safety with me.
> He denied any homicidal ideation, but reports he has chronic suicidal
> ideation. Thought still is well organized. No hallucinations, delusions or
> paranoia were noted. Higher cortical functioning, memory, comprehension
> all appeared impaired. Insight and judgment were limited. Estimated IQ
> appeared average-low average. Speech is soft, normal rate and rhythm.

(R. 658.)

Dr. Hapke diagnosed Plaintiff with a mood disorder NOS 296.90, chemical

dependency, antisocial personality disorder, and a borderline personality disorder. (*Id.*)

According to Dr. Hapke, due to Plaintiff's chronic violence, chronic suicidality, and

possible low IQ, Plaintiff had a chronic risk of being a danger to himself and society.

(*Id.*) Given that he denied any present intent to harm himself or others, Dr. Hapke

recommended continued outpatient treatment and a partial hospital program. (*Id.*)

Plaintiff testified at the hearing before the ALJ that he did not participate in the partial

hospitalization because he would have lost his apartment and been homeless again.  (R. 53.)

On April 21, 2015, Patrick R. Stokes, M.D., filled out a medical opinion diagnosing Plaintiff with schizoaffective disorder and PTSD, which was expected to last at least 60 days during which time he was unable to work.  (R. 824.)

On April 22, 2015, state agency psychologist Kari Kennedy, Psy.D., conducted a psychiatric review technique based on the available documents through the date last insured of December 31, 2014.  (R. 73.)  Dr. Kennedy determined that Plaintiff had no mental medically determinable impairments established.  (R. 73.)  She also conducted a psychiatric review technique for the period through April 22, 2015.  (R. 83-84.)  Dr. Kennedy concluded that Plaintiff had the following severe mental impairments: affective disorder, personality disorder, borderline intellectual functioning, anxiety, and a substance action disorder.  (R. 82-83.)  Based on these impairments, Dr. Kennedy concluded that Plaintiff had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration.  (R. 83.)  Dr. Kennedy also concluded that Plaintiff was not significantly limited as to his ability to remember locations and work-like procedures; not significantly limited as to his ability to understand and remember very short and simple instructions; and moderately impaired as to his ability to understand and remember detailed instructions.  (R. 85.)  Further, Dr. Kennedy concluded that Plaintiff demonstrated no significant limitations with respect to the ability to carry out very short

and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or in proximity to others without being distracted by them; and the ability to make simple work-related decisions.  (R. 85-86.)  Dr. Kennedy concluded that Plaintiff was moderately limited in his ability to: carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable amount of rest periods.  (R. 85-86.)  In addition, Dr. Kennedy opined that Plaintiff was moderately limited as to his ability to appropriately interact with the public; and not significantly limited with respect to his ability to ask simple questions or request assistance; his ability to accept instructions and respond appropriately to criticism from supervisors; his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness  (R. 86.)  Dr. Kennedy assigned the following RFC to Plaintiff:

> The totality of evidence in file suggests that the claimant is able to: understand, carry out and remember simple instructions; able to make judgments commensurate with functions of unskilled work; able to respond appropriately to brief supervision and interactions with coworkers and work situations; able to deal with changes in a routine work setting.  Clmt may prefer to work in a position that requires minimal interaction with others.  Clmt appears capable of unskilled work.

(R. 87.)

On April 28, 2015, a transfer summary from Plaintiff's social workers noted that Plaintiff had been obtaining psychotherapy counseling from October 7, 2014 through April 28, 2015 for his PTSD and schizophrenia. (R. 817.) One of the initial goals was for Plaintiff to reduce the impact of his traumatic past on his daily life. (*Id.*) It was noted that Plaintiff had a "slight improvement" to this goal. (*Id.*) Plaintiff still experienced night terrors, but gained some insight into how his childhood experiences had impacted him. (*Id.*) He also showed a slight improvement to the goal of learning about his thought disorder and working to build coping skills. (*Id.*) Plaintiff had built skills in redirecting his thoughts and behavior when experiencing command hallucinations. (*Id.*) He had met with a psychiatrist but denied medications. (*Id.*) Plaintiff was encouraged to continue counseling for his mental health. (*Id.*)

On July 28, 2015, Dr. Stokes filled out another medical opinion diagnosing Plaintiff with schizoaffective disorder and PTSD, which was expected to last at least 60 days and that he was unable to perform limited work until January 1, 2016. (R. 825.)

On November 10, 2015, Plaintiff saw Dr. Stokes related to his mental health and a medication refill. (R. 682.) Plaintiff claimed to have delusional thinking and auditory hallucinations, but also claimed he could tolerate them and he did not want to change his medications. (*Id.*) Plaintiff was sleeping well. (*Id.*) Plaintiff did not want therapy for his PTSD. (*Id.*) He denied thoughts of harming himself. (R. 683.) He also denied having harmed anyone. (*Id.*) The mental status assessment of Plaintiff revealed that his appearance was appropriate and disheveled; he was cooperative but very irritable and very negative; he was agitated; he had an appropriate affect; he had an anxious and

depressed mood; he had an intact and more organized thought process; he professed hearing voices every day and talking to the voices; he was fully oriented and had an intact memory. (*Id.*) Plaintiff was diagnosed with schizoaffective disorder, intermittent cannabis abuse, and a rule-out diagnosis for PTSD. (R. 684.) Dr. Stokes also filled out a medical opinion diagnosing Plaintiff with schizoaffective disorder, which was expected to last at least 60 days during which time he was unable to work until at least May 1, 2016. (R. 826.)

In August 2015, state agency psychologist, Richard Pallazza, Ph.D, L.P., also evaluated Plaintiff's mental impairments. (R. 103.) Dr. Pallazza concluded that Plaintiff had a mild restriction to his activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration. (R. 104.) Dr. Pallazza concluded that Plaintiff demonstrated no significant limitation with respect to: the ability to carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or in proximity to others without being distracted by them; and the ability to make simple work-related decisions. (R. 106.) Dr. Pallazza concluded that Plaintiff was moderately limited: in his ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods. (R. 106-07.) In addition, Dr. Pallazza opined that Plaintiff was moderately limited as to: his ability to appropriately interact with the public; and not significantly limited with respect to his ability to ask simple questions or request assistance, ability to accept instructions and respond appropriately to criticism from supervisors, ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness (R. 107.) Dr. Pallazza's RFC was similar to Dr. Kennedy's RFC. (R. 87, 108.) Dr. Pallazza also noted that Plaintiff's ability to respond appropriately to changes in the workplace as moderately limited. (R. 109.) Dr. Pallazza's determination did not change significantly on his August 6, 2015 reconsideration. (R. 122-30.)

On April 26, 2016, Plaintiff saw Dr. Stokes for a mental health follow-up for schizoaffective disorder, PTSD, and a prescription refill. (R. 687.) Plaintiff represented that he had the following signs and symptoms of these disorders: anxiety, aloofness, hallucinations, nightmares, flashbacks, and anhedonia. (*Id.*) Features for depression included insomnia and impaired concentration. (*Id.*) Plaintiff reported auditory hallucinations and voices. (R. 688.) Plaintiff was diagnosed with schizoaffective disorder, intermittent cannabis abuse, and a rule-out diagnosis of PTSD. (R. 689.) He was taking Seroquel and Zoloft. (R. 690.) Dr. Stokes also filled out a medical opinion diagnosing Plaintiff with schizoaffective disorder and PTSD, which was expected to last at least 60 days during which he was unable to work at least until November 1, 2016. (R. 827.)

On September 15, 2016, CNS Beth Spooner-Falde filled out a medical opinion diagnosing Plaintiff with complex and chronic PTSD, major depressive disorder, and borderline intellectual function based on testing, which was expected to last more than 45 days and that he was unable to work for the foreseeable future. (R. 828.) CNS Spooner-Falde also opined that Plaintiff had permanent mental limitations in the form of vulnerability to anxiety and being reactive in stressful situations. (*Id.*)

On October 20, 2016, CNS Spooner-Falde filled another medical opinion diagnosing Plaintiff with complex and chronic PTSD, and a history of major depressive disorder, which was expected to last more than 45 days, and that Plaintiff was unable to work for the foreseeable future. (R. 829.) She also opined that Plaintiff had permanent mental limitations in the form of poor distress tolerance. (*Id.*)

During his May 2, 2016, annual exam, Plaintiff noted that he was no longer homeless. (R. 732.) Plaintiff's mood had worsened, and sometimes did not want to be around other people. (*Id.*) He claimed he heard voices saying his name at times, which woke him up from his sleep. (R. 733.) Plaintiff claimed a passive suicidal ideation and noted that his appetite was poor. (*Id.*) Plaintiff also represented that he was looking to get back into autobody work. (R. 734.) Plaintiff's affect was normal, his speech was fluent, and his thought content was linear. (R. 735.) Dr. Kathelyn Bezek and Plaintiff agreed that he needed a psychiatrist, as his depression was long-standing and severe. (R. 736.) Plaintiff declined higher dosages of medications. (*Id.*)

On September 6, 2016, Plaintiff presented for a psychiatric evaluation as the result of depression, anxiety, and anger management problems. (R. 738.) The present problem

was anxiety and visual hallucinations. (*Id.*) Plaintiff claimed to CNS Spooner-Falde that he saw ghosts at night, which increased his anxiety. (*Id.*) Plaintiff professed to using marijuana because his mind raced and he needed to reduce his negative thoughts. (*Id.*) The mental and cognitive examinations showed that: Plaintiff was appropriately dressed and groomed; showed good hygiene; he was cooperative and appropriate; he showed a normal gait and motor coordination; his speech was non-pressured, with some problem staying organized and reasonably responsive to interview questions; his comprehension and expression was appropriate; was distractible; oriented to person, place, and time; his thought process was reasonably organized and anxious; he reported racing thoughts, and visual hallucinations with some paranoid ideation; his thought process was reality based; he had no impairment to memory; he was tangential, but could be directed; his mood was anxious with reports of having a temper; his affect was appropriate to content of speech and circumstance; his intelligence was estimated to be below average; his fund of knowledge was limited; there was no evidence of self-danger, no reports of suicidal or homicidal ideations; he had fair insight and judgment; he professed sleep problems and very low energy; his decision-making appeared limited; his attention and concentration were marginal; his memory and fund of knowledge were fair to poor on gross examination; his organization was impaired; his ability to provide history was limited; and he noted that he liked his friend and his friend's girlfriend, who Plaintiff lived with. (R. 739-40.) CNS Spooner-Falde diagnosed Plaintiff with major depressive disorder per history; PTSD; psychosis NOS, and rule-out diagnosis for marijuana-induced psychosis.

(R. 742.)  CNS Spooner-Falde also found that Plaintiff had a borderline intellectual function by history.  (*Id.*)

In addition, CNS Spooner-Falde noted that Plaintiff was impulsive but had enough self-control to keep himself clear of trouble legally; his judgment was mildly impaired with his choice of roommate in a subsidized apartment.  (*Id.*)  It was also noted that Plaintiff had been seen at Ramsey County Mental Health Clinic, but he did not want to continue there as the recommendation was to raise his Seroquel to 400 mg, which he thought was too high.  (*Id.*)  CNS Spooner-Falde advised Plaintiff that he needed to be substance-free if he wanted disability benefits.  (*Id.*)

Plaintiff again saw CNS Spooner-Falde on October 20, 2016.  (R. 744.)  Plaintiff described his overall mood as upbeat and he was very talkative.  (*Id.*)  Plaintiff reported that the medication prazosin was helpful for his sleep.  (*Id.*)  Plaintiff's appetite was normal, he had no change in his energy, he had no auditory hallucinations, but claimed to see spirits, and sometimes was paranoid.  (R. 744-45.)  Plaintiff was appropriately groomed, his speech was normal but pressured, no abnormal movements were observed, he had a reactive affect, no psychotic symptoms, he was oriented, his attention and concentration were mildly impaired, insight and judgment were limited, and he reported that his anger management was stable and appropriate.  (R. 745.)  Plaintiff noted that he would have thoughts of harming people when he would get escalated.  (R. 747.)  Plaintiff noted he stayed at home most days.  (*Id.*)  CNS Spooner-Falde noted that Plaintiff was hyperverbal and highly animated during the examination.  (*Id.*)  She could not rule out bipolar disorder.  (*Id.*)  Plaintiff represented that he would like to work on autobody

repair, but did not feel he could do so due to interpersonal conflicts he experienced. (*Id.*) Plaintiff's mood was sad and anxious. (*Id.*) Plaintiff reported that there were four ghosts living in his apartment who were friendly, and that he has had this problem since age eight. (*Id.*) He had no suicidal or homicidal ideations. (*Id.*)

On December 2, 2016, Plaintiff had a medication management appointment. (R. 751.) He was initially aroused and anxious from noise and activity in the lobby and he refused to be seen if the resident was present. (R. 751.) Plaintiff was impulsive and loud but regretted dismissing the resident and asked the nurse to go get her after he settled into the office. (R. 754.) Plaintiff described his mood as irritable and reactive, his sleep was adequate, his anxiety and panic level was high, he had no feelings of hopelessness, and had no hallucination or delusions. (R. 751-52.) Plaintiff's affect was edgy and inattentive, he was appropriately dressed and groomed, he was reactive, his speech was appropriate, his thought process was intact, he did not have psychotic symptoms, he was oriented, his attention and concentration were impaired, his memory and fund of knowledge were limited on gross examination, his insight and judgment were limited, he reported anger management problems, had ongoing impulsivity, suicidal ideations with no plan, and no homicidal ideations. (R. 752-53.) Plaintiff was also a poor historian. (R. 754.) Plaintiff was diagnosed with anxiety disorder NOS, impulse control disorder, with a rule-out diagnosis of attention deficit with hyperactivity disorder and borderline intellectual functioning. (*Id.*) Plaintiff reported being socially isolated. (*Id.*) It was noted that Plaintiff had not started Lexapro when he dropped his Zoloft. (R. 754.) Plaintiff's dosage for prazosin was also increased. (*Id.*)

Plaintiff again saw CNS Spooner-Falde on January 17, 2017. (R. 757.) Plaintiff has been taking prazosin but had not been taking Lexapro, for reasons he could not explain. (*Id.*) Plaintiff wanted to be given Remeron, which Dr. Rauenhorst had given him previously. (*Id.*) CNS Spooner-Falde noted that she had received disability forms from Plaintiff's disability services lawyer. (*Id.*) CNS Spooner-Falde and Plaintiff started but were unable to complete this form. (*Id.*) CNS Spooner-Falde asked him to reschedule to complete the form at his convenience. (*Id.*) Plaintiff wanted CNS Spooner-Falde to assign him with a schizophrenia diagnosis, but Spooner was not sure if she had adequate information to do so. (R. 758.) Plaintiff had no hallucinations or delusions, was paranoid, had impaired organization of thought, was appropriately dressed, was somewhat less intense, his speech was appropriate, he had an intense affect, he exhibited no psychotic symptoms, was oriented, his attention was impaired, and he had limited memory and judgment. (*Id.*) Plaintiff also reported that his anger management was fairly stable, but his frustration tolerance was still very low. (*Id.*)

On January 25, 2017, Plaintiff reported problems with audio hallucinations to CNS Spooner-Falde. (R. 763.) Paranoia was also noted. (*Id.*) Plaintiff was appropriately dressed, he was calm and relaxed, he was cooperative, his speech was appropriate, he had an appropriate affect, he exhibited psychotic symptoms, he was oriented, his attention was mildly impaired, his memory was satisfactory, and he had a limited judgment. (R. 763, 765.) Forms were completed for disability benefits. (R. 766.) Plaintiff was also prescribed with Geodon for his auditory and paranoid ideations. (*Id.*)

On January 25, 2017, CNS Spooner-Falde wrote a letter in support of Plaintiff's pursuit of disability benefits. (R. 677.) She noted that Plaintiff had a history of seeking psychiatric care over the previous several years for depression with psychotic symptoms and anxiety, and had been treated for psychosis. (*Id.*) The diagnosis for Plaintiff remained major depressive disorder with psychosis, general anxiety disorder, marijuana dependence, and borderline intellectual functioning. (*Id.*) CNS Spooner-Falde opined that Plaintiff's decision-making capacity was limited, although he had been managing his funds independently, he had long-term trouble with tolerating people, was impulsive, and his judgment was impaired. (*Id.*)

CNS Spooner-Falde also filled out a mental source statement on the same date. (R. 678.) CNS Spooner-Falde believed that Plaintiff's prognosis was guarded due to his impulse control problems. (*Id.*) She also noted that Plaintiff was being treated with prazosin and Lexapro for his anxiety. (*Id.*) Plaintiff's impairments were expected to last longer than 12 months, and she did not believe he was a malingerer. (*Id.*) CNS Spooner-Falde believed that Plaintiff had an extreme limitation to understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for more than a two-hour segment, performing activity with regular attention and punctuality, completing a normal workday without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number of rest periods, getting along with peers or coworkers without distracting them; and had a marked limitation to his ability to make simple work-related decisions, interact appropriately with the public, accept instructions and respond

appropriately to criticism from supervisors, maintain socially appropriate behavior and adhere to standard of cleanliness, travel to unfamiliar places, independently set goals, and tolerate normal levels of stress. (R. 679.) Plaintiff had moderate limitations to remembering very short and simple instructions, carrying out simple instructions, asking simple questions to request assistance, and with being aware of hazards; and no or mild limitations related to remembering location and work-like procedures. (*Id.*) According to CNS Spooner-Falde, the limitations were supported by Plaintiff's chronic auditory hallucinations, which distracted and confused him in social and work situations. (*Id.*) CNS Spooner-Falde also opined that Plaintiff would require unscheduled breaks due to restlessness and anxiety, and estimated that Plaintiff would miss more than three days per month from work due to necessary therapy. (R. 680.) She also believed that Plaintiff's paranoid perception of being watched, including his claims of being observed in his apartment, would interfere with his ability to work. (*Id.*)

On April 21, 2017, Plaintiff reported ongoing auditory hallucinations in the form of whispering. (R. 769.) Plaintiff also reported living in a haunted apartment with spirits following him. (*Id.*) He had no distress about the spirits. (*Id.*) Plaintiff reported having auditory hallucinations during the session, however, CNS Spooner-Falde noted "no obvious distractibility with auditory hallucination in session." (R. 770.) Plaintiff was appropriately dressed and groomed; his language and speech were appropriate; his affect was appropriately reactive; his thought processes were goal-directed and associations were intact; he did not have psychotic symptoms; he was oriented to time, place and person; his attention and concentration were intact; he was very clear on what paper he

needed for his future disability case; his memory and fund of knowledge were fair on gross examination; his insight and judgement were limited; he reported that his anger management was stable; and showed impulsivity verbally during his session.  (*Id.*)  CNS Spooner-Falde believed that Plaintiff had a serious and persistent mental illness.  (R. 772.)  She also noted that "may have better evidence for disability if he follow up [sic] with psychological evaluation."  (*Id.*)

On June 8, 2017, Plaintiff reported to CNS Spooner-Falde that he had ongoing auditory hallucinations.  (R. 776.)  In addition, Plaintiff claimed to be hearing someone banging at his door even though there was no one at the door.  (*Id.*)  Plaintiff asserted he was experiencing auditory hallucinations during the meeting, but exhibited no obvious distractibility during the session.  (R. 777.)  Plaintiff was appropriately dressed and groomed, his speech/language was appropriate, his affect was appropriately reactive, his thought processes were goal-directed and associations were intact, he did not have overt psychotic symptoms, he was oriented, his attention and concentration were intact, he was very clear on what paper he needed for his disability case, his insight and judgment were limited, and his memory and fund of knowledge were fair on gross examination.  (*Id.*) Plaintiff mentioned his upcoming disability hearing.  (R. 779.)  His mood was anxious, he showed no overt disorder of thought form, he remained hypervigilant and anxious, and was organized during his interview.  (R. 780.)

During the August 17, 2017 hearing before ALJ, Medical Expert Cheryl Buechner, Ph.D., M.F.A., ("ME") testified in relevant part as follows:

So primarily, Your Honor, I think we're looking at 12.03, the schizoaffective disorder, and 12.15, the PTSD, 4F 3, 15F 25, 14F 52, along with pretty regular cannabis dependence through at least September of last year, and prior to that there's several — for example, 8F 12, indications of possible symptom exaggeration or even malingering. 8A 17 also suggests that veracity has been doubted in several mental health settings. So the B criteria, Your Honor, 4F and 12F in particular, indicates several marked or extreme rankings that I would say appear to be the case in the presence of the marijuana dependence. At least up to the last year, and there's not good documentation of the last symptoms during the last year to determine an improved differential diagnosis, or ratings in the absence of the marijuana.

(R. 54-55.)

### III.    <u>LEGAL STANDARD</u>

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions.'" *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (citation omitted). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004). "Assessing and resolving credibility is a

matter properly within the purview of the ALJ. Chaney v. Colvin, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir.2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

## IV. <u>DISCUSSION</u>

Plaintiff argues that the ALJ erred when "he rejected the consistent opinions of Plaintiff's treating specialists, the Agency's examining psychological expert and the Agency's testifying psychological expert, which all patently support Plaintiff's claim that he is disabled." (Dkt. 18 at 1, 4.) Plaintiff points to the April 2013 opinion of Dr. Pathak, the "off work" opinions given from 2013 to 2016 by Plaintiff's treating providers; the January 2017 opinion of CNS Spooner-Falde, and the opinion of the ME in support of his motion.[3] (*Id.*)

### A. The Weight Assigned to the Medical Opinions

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no

---

[3] While Plaintiff asserts in his reply that Defendant did not address a number of his arguments (Dkt. 22 at 2), the only developed arguments raised in his initial motion pertained to the weight given by the ALJ to the opinions provided by his treating providers, Dr. Pathak, and the ME.

requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted) (highly unlikely that ALJ did not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes).

In evaluating a claimant's work-related limitations, the ALJ must evaluate every medical opinion received from acceptable medical sources. *See* 20 C.F.R § 404.1527(c). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).  Generally, the ALJ gives more weight to medical opinions from treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R § 404.1527(c)(2).

"A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. An ALJ may elect under certain circumstances not to give a treating physician's opinion controlling weight. For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with the other substantial evidence in [the] case record.'" *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)) (citing *Goff*, 421 F.3d at 790; *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)). "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)); *see also Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("However, '[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)) (alteration in original) (internal quotation omitted).

**B.     Whether the ALJ Properly Considered the Factors Under 20 C.F.R. §§ 404.1527 in Assessing the Weight Given to Medical Opinions.**

According to Plaintiff, the ALJ failed to give good reasons to give no more than "little weight" to the opinions from Dr. Pathak, the multiple "off work" opinions (2013-2016) of Plaintiff's treating providers; the January 2017 opinion of CNS Spooner-Falde, and the opinion of the ME. (Dkt. 18 at 16-17.) In particular, Plaintiff argued that the

ALJ failed to consider all of the required factors as set forth in the regulations under 20 C.F.R. § 404.1527 in assessing these medical opinions. (*Id.* at 17.)

If a medical opinion is not afforded controlling weight, the ALJ must consider the following factors in deciding what weight it is due: (1) the existence of an examining relationship; (2) the nature of the treatment relationship, such as length of treatment and frequency of examination; (3) the degree to which the opinion is supported by medical evidence such as medical signs and laboratory findings; (4) consistency with the record as a whole; (5) the source's specialty; and (6) any other relevant factors. 20 C.F.R. § 404.1527(c). The Social Security Administration ("SSA") also directs an ALJ to consider the same set of factors for weighing opinions from non-examining, consulting physicians, as well as the medical opinions from medical sources who are not accepted sources. *See Dols v. Saul*, No. 18-1910, --- F.3d ---- 2019 WL 3366655, at *8 (8th Cir. July 26, 2019) (citing 20 C.F.R. § 404.1527(c), (f)(1)); *see also* SSR 06-03P, 2006 WL 2329939, at *3-5; *Scott M. v. Berryhill*, No. 17-CV-5086 (ECW), 2019 WL 572654, at *5 (D. Minn. Feb. 12, 2019).

Here, Plaintiff admits that the ALJ "acknowledged his duty to weigh the opinion evidence according the § 404.1527 factors, stating in a boilerplate section on page 17 of his decision: 'in determining the appropriate weight to give any medical source opinion, the regulations require the undersigned consider: (1) the examining relationship between the medical source and the claimant; (2) the treatment relationship, including the length of the relationship, frequency of examinations, and nature and extent of the treating relationship; (3) support by medical evidence; (4) consistency of the opinion with the

record as a whole; (5) the source's specialization or lack thereof; and (6) any other factors which support or contradict the opinion.'" (Dkt. 18 at 17-18.) However, Plaintiff asserts that the ALJ's analysis casts doubt regarding his claimed consideration of the factors. (*Id.* at 18.) Specifically, Plaintiff asserts: (1) that the ALJ's analysis considered the opinions in isolation from each other, without acknowledging that they support each other in their agreement that Plaintiff's ability to perform full-time work due to his mental impairments is far more limited than the ALJ's RFC describes; (2) the ALJ failed to give any obvious consideration to the fact that CNS Spooner-Falde, Drs. Rauenhorst and Stokes, and licensed social worker Acker are all treating sources; and (3) the ALJ did not discuss the length and frequency of treatment or whether they examined Plaintiff. (*Id.* at 18-20; Dkt. 22 at 1-5.)

The Court finds no error as it relates to the ALJ's consideration of the factors under § 404.1527(c). First, "the regulations do not strictly require the ALJ to explicitly discuss each factor under 20 C.F.R. § 404.1527(c)." *Mapson v. Colvin*, No. 14-cv-1257 (SRN/BRT), 2015 WL 5313498, at *4 (D. Minn. Sept. 11, 2015) (cleaned up) (citing *Roesler v. Colvin*, No. 12-cv-1982 (JRT/JJK), 2013 WL 4519388, at *5, n.5 (D. Minn. Aug. 26, 2013)). Rather, when assigning weight to a medical opinion, the ALJ should explain his decision regarding the weight given to a medical opinion to "allow[ ] a claimant or subsequent reviewer to follow the adjudicator's reasoning." 20 C.F.R. § 404.1527(f)(2); *see also Kuikka v. Berryhill*, No. 17-cv-374 (HB), 2018 WL 1342482, at *5 (D. Minn. Mar. 15, 2018). The Court finds that the ALJ adequately provided his basis for the little to no weight assessed to the opinions of Drs. Pathak and Buechner, as well as

CNS Spooner-Falde, and adequately addressed the factors under 20 C.F.R. §§ 404.1527(c)(2). The ALJ addressed the inconsistency in the opinions and supportability of the record in relation to the provider's own treatment notes and the record as a whole. (R. 31-33.) Moreover, contrary to Plaintiff's assertion, the ALJ acknowledged that CNS Spooner-Falde, Drs. Rauenhorst and Stokes, and licensed social worker Acker were all treating providers, and sufficiently set forth the extent of their involvement with the treatment of Plaintiff. (R. 21, 25-30, 32-33.) For all of these reasons, the Court rejects Plaintiff's assertion that the ALJ failed to adequately consider the factors under 20 C.F.R. § 404.1527.

Moreover, while it is not entirely clear, Plaintiff appears to also argue that ALJ erred by giving substantial weight to the state agency physicians instead of contradictory opinions of treating/examining providers, on the basis that the state agency physicians never examined Plaintiff. (Dkt. 20 at 20-21.) This Court disagrees. "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, 1996 WL 374180, at *2 (S.S.A. July 2, 1996). In fact, an ALJ "must consider and evaluate" a state agency medical consultant's residual functional capacity assessment. *Id.* at *4. Moreover, in appropriate circumstances, opinions from state agency consultants "may be entitled to greater weight than the opinions of treating or examining sources." *Id.* at *3. The Eighth Circuit has affirmed ALJ decisions that properly discounted treating physicians' opinions and gave significant weight to state agency assessments. *See, e.g.*, *Smith v. Colvin*, 756 F.3d 621, 626-27 (8th Cir. 2014);

*Michel v. Colvin*, 640 F. App'x 585, 593 (8th Cir. 2016) (identifying exceptions to the general rule that an ALJ should credit a treating physician's opinion over other medical opinions); *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007) (citing *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003)).  Moreover, to the extent Plaintiff contends that the state agency physicians' opinions alone do not constitute substantial evidence, as illustrated in Section IV.D-E, *infra*, other evidence in the record constitutes substantial evidence supporting the ALJ's determination of the RFC, including the treating providers' notes and Plaintiff's conservative course of treatment.  *See Hensley*, 829 F.3d at 932 ("[T]here is no requirement that an RFC finding be supported by a specific medical opinion.").

**C.      Whether the ALJ Gave Proper Consideration to the Provider's Opinions that Plaintiff Was Unable to Work.**

With respect to the provider's opinions that Plaintiff was unable to work between 2013 and 2016, the ALJ found that "[t]he undersigned is unable to give these opinion[s] **great weight**, as the issue of whether an individual is capable of work activity is reserved to the Commissioner."   (R. 32. (citing 20 CFR 404.1527(d) (emphasis added).)

Plaintiff argues that the ALJ erred because the SSA has instructed adjudicators to "'carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner'" and to seek clarification from providers. (Dkt. 18 at 21-22 (quoting SSR 96-5p).) (emphasis added).

However, it is important to note that there is no evidence in the record that the ALJ did not carefully consider the "unable to work" opinions of Plaintiff's providers,

only that he did not give them "great weight." (R. 32.) Under Rule SSR 96-5p, relied upon by Plaintiff, "treating source opinions on issues that are reserved to the Commissioner **are never entitled to controlling weight or special significance**. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5P, 1996 WL 374183, at *2 (emphasis added); *see also Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (quoting 20 C.F.R. §§ 416.927(e)(1), (3)) (citation omitted) ("[A] treating physician's opinion that a claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability."). Indeed, the Eighth Circuit has held that "[a] treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) (citing *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002)).

Therefore, the Court finds that the ALJ did not err by not giving great weight to the providers' opinions that Plaintiff was unable to work.

**D.     Weight Given by the ALJ to Dr. Pathak's Opinions**

According to Plaintiff, the ALJ erred when he discredited the opinions of Dr. Pathak on the basis that they lacked supporting objective findings given the numerous

tests performed by Dr. Pathak as part of her evaluation of Plaintiff.[4] (Dkt. 18 at 22-23.)

With respect Dr. Pathak's opinion, the ALJ found as follows:

> After examining the claimant in 2013, Dr. Pathak indicated it was unlikely the claimant would be able to establish and maintain employment at that time without mood stabilization, therapeutic support, and vocational support. (Exhibit B-4F, p. 9) She also opined the claimant had 'poor or none' ability in the following work-related areas of functioning: remember work-like procedures; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal work-day and work-week without interruptions from psychologically-based symptoms; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; and deal with normal work stress. (Exhibit B-4F, p. 10) In the remaining areas of work-related activity noted on the form, she indicated 'fair' abilities. (id.)

> Dr. Pathak's assessment is given little weight in terms of the conclusory assessment that the claimant could not perform employment. Her specific work-related restrictions are also given little weight, as they are not consistent with the overall evidence of record and the claimant's course of care for his mental health symptoms. Dr. Pathak did not provide specific objective findings to support her conclusions. Further, her conclusions are not consistent with the objective mental status examination findings of record, discussed in detail above, which establish some deficits in thought process at times, but also that the claimant is able to manage his own healthcare, including medications, as well as finances and living independently. (Exhibit B-8F, p. 12; Exhibit B-14F, pp. 49-50, 62, 65) Though the claimant has reported difficulty getting along with others subjectively, this is not demonstrated objectively in the file, nor has the claimant had legal difficulty during the relevant time period related to difficulty getting along with others. This suggests the claimant has more social skills and ability to control his anger than alleged. As a result of these inconsistencies, Dr. Pathak's assessment is given little weight in determining the claimant's residual functional capacity.

(R. 31-32.)

---

[4] The Court notes that Plaintiff characterizes Dr. Pathak as the SSA's consultative expert. (Dkt. 18 at 22.) However, Dr. Pathak was associated with Plaintiff's representative at South Metro Services. (R. 351-52.)

Defendant asserts that the ALJ properly discounted the opinions of Dr. Pathak because they lacked any objective basis.  (Dkt. 21 at 7.)  While Defendant acknowledges that "Dr. Pathak's assessment contained objective test results, Dr. Pathak did not explain how these results translated into the severe mental limitations that she assessed.  Rather, she left blank the portion of the opinion that asked her to identify the particular medical or clinical findings that supported her opinion."  (*Id.* (citations omitted).)  In addition, Defendant argued that the ALJ properly discounted the opinion on the basis that it was inconsistent with the record as a whole, inconsistent with Plaintiff's overall course of conservative care for his mental symptoms, and inconsistent with his daily activities, including his ability to manage his own finances and healthcare, including medications, and live independently.  (*Id.* at 8-9.)  Moreover, Defendant references that while Plaintiff subjectively reported difficulties getting along with others, this was not demonstrated objectively in his file, nor did he have legal difficulties during the relevant period related to difficulties getting along with others, which further undermines Dr. Pathak's assessment.  (*Id.* at 9-10.)

The Court finds that the ALJ's decision to give little weight to the consultant examiner Dr. Pathak's assessment as to Plaintiff's RFC is based on substantial evidence in the record, as a whole, despite the objective testing performed by Dr. Rathak.  Dr. Pathak's extreme limitations, including, but not limited to, severe memory issues, an inability to get along with co-workers and supervisors and deal with work stresses, are not supported by her own mental status examination.  An expert's "own inconsistency may also undermine his opinion and diminish or eliminate the weight given his

opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)).  Here, Dr. Pathak's only mental status examination showed that Plaintiff: was present and oriented to all spheres, was appropriately dressed and groomed, he showed good eye contact, while he was anxious he, was pleasant and cooperative, his speech was goal oriented, there were no apparent difficulties regarding understanding interview questions or assessment instructions, there was no indication of an impaired reality, and he was a fair historian.  (R. 354).  In addition, the findings of Plaintiff's medical examinations and conservative course of treatment also do not support the limitations imposed by the consulting examiner.  Plaintiff's mental status examinations, including those around the time frame of Dr. Pathak's assessment, frequently demonstrated that when Plaintiff was taking his prescribed medications he was oriented, had normal speech, was cooperative, had an appropriate affect, had an intact and organized thought process, and had an intact memory.  (*See, e.g.,* R. 370, 375, 401, 403, 406, 411-13, 415-16, 427-28, 431-32, 435, 439, 445-46, 453, 477-78, 490, 683, 712, 724, 735, 770, 777.)

Where there were instances of Plaintiff complaining of a deteriorated mental state, many of those situations (*see e.g.*, R. 410, 413, 424, 427, 477, 481-82, 485, 754) dealt with Plaintiff being without medications, which he claimed were helpful and said that he felt worse without them.  *See Hensley v. Colvin*, 829 F.3d 926, 933-34 (8th Cir. 2016) (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").  In addition, there is no evidence of any hospitalization of Plaintiff resulting from his mental health

impairments.  Indeed, Plaintiff's depression and other mental impairments were conservatively managed with medications, and monthly to biweekly therapy sessions or medication appointments.  *See Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (physician's opinion undermined by claimant's conservative, routine course of treatment); *see also Rogers v. Berryhill*, 702 F. App'x 502, 503 (8th Cir. 2017) (taking into account the fact that the treating physicians "prescribed only conservative treatment" in the decision to discount the RFC opinion of a treating physician) (citation omitted); *Buford v. Colvin*, 824 F.3d 793, 797 (8th Cir. 2016) (finding that "conservative treatment [and] management with medication . . . support the ALJ's RFC determination"); *Su Yang v. Berryhill*, No. 17-CV-0686 (HB), 2018 WL 1277003, at *5 (D. Minn. Mar. 12, 2018) (finding that the ALJ properly discounted the opinion of a treating physician because the claimant's "depression and other mental impairments were conservatively managed with medication, monthly medication evaluations with Dr. Bebchuk, and biweekly therapy sessions").

Moreover, while there is no dispute that Plaintiff professed audio hallucinations, the substantial evidence in the record is that even to the extent that such hallucinations are credible, they did not impact Plaintiff's RFC.  Indeed, CNS Spooner-Falde noted that while Plaintiff professed auditory hallucinations during examinations, he exhibited no obvious distractibility during the meeting.  (R. 770, 777.)  Plaintiff himself professed that although he continued to have delusional thinking and auditory hallucinations, he represented that he could tolerate them, and he did not want to change his medications. (R. 682.)  Moreover, there is no independent evidence that Plaintiff had acted on his

professed hallucinations. Further, the evidence is that Plaintiff had been out of prison since the early 2000s with no additional involvement with the legal system since 1995, and Plaintiff admitted that he has not harmed anyone. (R. 355, 500, 656.) Indeed, despite the claim by Dr. Pathak regarding Plaintiff's inability to get along with peers, the record shows that he was getting along very well with his roommate and his girlfriend who both lived with Plaintiff. (R. 740 ("likes his friend and her girlfriend[.] That live with him.").) *See Thomas v. Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018) ("Thomas's self-reported activities of daily living provided additional reasons for the ALJ to discredit Dr. Hollis's pessimistic views of her abilities."). In addition, while Plaintiff reported a history of hearing voices telling him to harm others, Dr. Pathak noted that "[h]e reported having no history of difficulties getting along with bosses, and coworkers." (R. 355.) There is also medical evidence in the record that at least one provider questioned the veracity of Plaintiff's complaints related to his mental health. (R. 661.)

While there is evidence in the record supporting the limitations, substantial evidence in the record as a whole supports the decision to discount the opinions of consultant Dr. Pathak. *See Nash*, 907 F.3d at 1089 (citation omitted) ("If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."). In any event, the RFC did reflect Dr. Pathak's concerns regarding Plaintiff's ability to get along with others by including a limitation of "brief, infrequent and superficial contact with the public, coworkers, and supervisors." (R. 23.)

**E.     Weight Given by the ALJ to CNS Spooner-Falde's Opinions**

Plaintiff argues that the ALJ erred by discounting CNS Spooner-Falde's opinions

on the basis that that she relied extensively on Plaintiff's subjective reports and

limitations and that the record supported the provider's conclusions with respect to

Plaintiff's non-exertional limitations.  (Dkt. 18 at 22.)  With respect CNS Spooner-

Falde's opinions, the ALJ found as follows:

> Beth Spooner, CNS, authored a statement regarding the claimant dated in
> January 2017, where she indicated she had been working with the claimant
> from September 2016 through January 2017.  She indicated the claimant has
> a history of homelessness and seeking psychiatric care for depression with
> psychotic symptoms and anxiety.  She noted he has diagnoses of major
> depressive disorder with psychosis, generalized anxiety disorder, marijuana
> dependence, and borderline intellectual functioning.  She noted his decision-
> making capacity is limited, though he is able to manage his funds
> independently.  She also noted he has long-term interpersonal troubles with
> tolerating being around people, and he is impulsive with impaired judgment.
> (Exhibit B-12F, p. 1)  In three other forms completed in 2016 and 2017, Ms.
> Spooner-Falde indicated the claimant could not perform any employment in
> the foreseeable future.  (Exhibit B- 16F, pp. 11-13)
>
> Ms. Spooner completed a form for the claimant's representative, noting a
> guarded prognosis for the claimant due to impulse control problems.  She
> noted the claimant's medications help with anxiety and sleep.  She related
> the claimant is not a malingerer.  Ms. Spooner opined the claimant has
> 'extreme' limitation in the following areas of functioning: understand and
> remember detailed instructions; carry out detailed instructions; maintain
> attention and concentration for more than two-hour segments; perform
> activities within a schedule, maintain regular attendance, and be punctual
> within customary tolerances; sustain an ordinary routine without special
> supervision work in coordination with, or proximity to, others without being
> distracted by them; complete a normal work day and work week, without
> interruptions from psychologically-based symptoms, and perform at a
> consistent pace without an unreasonable number and length of rest periods;
> get along with coworkers or peers without distracting them or exhibiting
> behavioral extremes.  She also noted 'marked' deficits in a number of other
> areas, including: make simple work-related decisions; interact appropriately
> with the general public; accept instructions and respond appropriately to

criticism from supervisors; maintain socially-appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; ability to set realistic goals or make plans independently of others; ability to tolerate normal levels of stress. She opined the claimant would be absent from work more than three days per month. (Exhibit B-12F)

Ms. Spooner's assessment and conclusions are assigned little weight in determining the claimant's residual functional capacity for a number of reasons. Ms. Spooner apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. Ms. Spooner noted in treatment records she completed the forms with the claimant present. (Exhibit B-14F, pp. 67, 72) At her January 2017 appointment with the claimant, Ms. Spooner indicated the claimant presented with intensely reactive affect, but goal-directed thought processes and intact associations, as well as full orientation. She noted impaired attention, concentration, memory and fund of knowledge, but no specific examples of this. The claimant did not report hallucinations, though he endorsed paranoid ideation. (Exhibit B-l4F, pp. 68, 71) These mental status examination findings are not consistent with the degree of limitation Ms. Spooner indicates in her assessment of work-related restrictions for the claimant. Thus, while she is a treating provider, her conclusions are not consistent with the overall weight of the evidence and the claimant's course of care, and therefore her assessment is given little weight here.

(R. 32-33.)

Defendant argues CNS Spooner-Falde's opinion's regarding Plaintiff's limitations are based solely on subjective complaints that are contradicted by her own assessment on the very same day as her opinions. (Dkt. 21 at 12.) Defendant notes that Plaintiff helped with filing out the January 17, 2017 forms. (*Id.*) Defendant also claims that CNS Spooner-Falde's other treatment notes, the medical records as a whole, Plaintiff's improvement on medication, and Plaintiff's conservative treatment support the ALJ's decision to assess CNS Spooner-Falde's opinion's with little weight. (*Id.* at 14-15.)

First, the ALJ is correct that Plaintiff was involved with filling out the January 2017 disability forms. On January 17, 2017, the CNS Spooner-Falde represented that "I received forms from disability services lawyer-6 pg form. We started but were unable to complete this form. I asked him to reschedule to complete the form at his convenience." (R. 757.) Plaintiff at the time urged CNS Spooner-Falde to assign him with the diagnosis of schizoaffective disorder. (R. 758.) Plaintiff next saw CNS Spooner-Falde on January 25, 2017, the date of the Mental Medical Source Statement. (R. 678, 764.) "[A]n ALJ need not give a treating physician's opinion controlling weight when the opinion is based on a claimant's subjective complaints that [sic] ALJ does not find credible." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017*); see also McCoy v. Astrue*, 648 F.3d 605, 617 (8th Cir. 2011) ("Finally, the ALJ noted that Dr. Puente's evaluation appeared to be based, at least in part, on McCoy's self-reported symptoms and, thus, insofar as those reported symptoms were found to be less than credible, Dr. Puente's report was rendered less credible."). Given the reliance on Plaintiff's subjective complaints in making her assessment, the ALJ did not err in not providing controlling weight to the opinion of CNS Spooner-Falde, given that he did not find the subjective complaints to be credible.[5]

CNS Spooner-Falde's reasoning as to Plaintiff's functional limitations "was chronic auditory hallucinations which distract patient and get him confused in social situations and work situations" and paranoid perception of events. (R. 679-80.) However, for the same reasons set forth by the Court as to Dr. Pathak's opinions, the

---

[5] The Court notes that Plaintiff did not challenge the ALJ's credibility findings as it relates to his subjective complaints.

substantial evidence in the record, as a whole, supports the ALJ's RFC and his decision to discount CNS Spooner-Falde's extreme limitations, including those resulting from Plaintiff's reported auditory hallucinations/paranoia. This includes her own findings that while Plaintiff professed auditory hallucinations during examinations, he exhibited no obvious distractibility during the meeting as a result. (R. 770, 777.) Moreover, CNS Spooner-Falde's opinion that Plaintiff would get distracted in the work situations is contradicted by her own opinions that Plaintiff could satisfactorily remember work-like procedures and could understand and remember very short instructions and carry out those instructions, and also is contrary to some of her treatment notes showing at most a mild impairment to concentration. (*See*, *e.g.*, R. 679, 745, 777.) Again, it is important to note that the ALJ did take into account Plaintiff's impairments in social situations by limiting him to "to brief, infrequent and superficial contact with the public, coworkers, and supervisors." (R. 23.)

**F.      Weight Given by the ALJ to the ME**

Plaintiff also argues that the ME's findings demonstrate that the ALJ erred in not making a determination as to the materiality of Plaintiff's drug and alcohol ("DAA") use with respect to a disability finding. (Dkt. 18 at 24-25.) The ME's testimony related to whether the "'marked' or 'extreme'" limitations imposed by Dr. Rathak and CNS Spooner-Falde "would appear to be the case in the presence of the marijuana dependence." (R. 54-55.)

The materiality of a Social Security claimant's DAA use need only be considered once a claimant is deemed disabled. *See* SSR 13-2p ("Under the Act and our regulations,

we make a DAA materiality determination only when [w]e have medical evidence from an acceptable medical source establishing that a claimant has a Substance Use Disorder, **and [w]e find that the claimant is disabled** considering all impairments, including the DAA.") (emphasis added). Here, the ALJ determined that Plaintiff was not disabled even when considering the extent and severity of his substance abuse. (R. 31.) Because the ALJ determined that Plaintiff was not disabled even when considering his DAA, he was not required to inquire into the materiality of Plaintiff's DAA or to employ the six-part test set forth in SSR 13-2p. *See* SSR 13-2P.

## V.    ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.    Plaintiff Edward W.'s Motion for Summary Judgment (Dkt. 17) is **DENIED**;

2.    Defendant Commissioner of Social Security Andrew Saul's Motion for Summary Judgment (Dkt. 20) is **GRANTED**; and

3.    This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED: September 6, 2019                 *s/ Elizabeth Cowan Wright*
                                         ELIZABETH COWAN WRIGHT
                                         United States Magistrate Judge